# CHARLESTON.

L. E. TIERNEY v. UNITED POCAHONTAS COAL COMPANY *et als.*

Submitted February 3, 1920.   Decided February 17, 1920.

1. CORPORATIONS—*Sale of all Assets Will be Set Aside at Suit by Minority Stockholders Unless at Fair Price and Free from Fraud.*

    The sale of all of the assets of a corporation, which is under the control and management of one individual, to another corporation, of which such individual is the sole owner, will be set aside at the suit of a minority stockholder of such selling corporation, unless it appears that the same was made for a fair and adequate price, and was free from fraud or unfair dealing.   (p. 558).

2. EQUITY—*Convenience as Test of Multifariousness.*

    There is no certain rule for determining when a bill is multifarious. If it appears that the matters in controversy between the parties can be more conveniently litigated in one suit, and that such procedure will not involve an undue burden or expense upon the defendants, a bill will not be held multifarious, even though it may unite more than one cause of action against the common defendants.   (p. 560).

3. CORPORATIONS—*When Suit by Minority Stockholder to Vacate Sale of Assets as Fraudulent Will be Barred by Laches.*

    The defense of laches will not bar a suit by a minority stockholder to set aside a sale made of the assets of a corpora-

85 W. Va.

tion upon the ground that the same is fraudulent and unfair, unless it appears that such stockholder has delayed an unreasonable time in bringing his action after he was in full knowledge and possession of all the essential facts necessary for him to determine whether or not he will accept the provisions of the sale, or repudiate the same.  (p. 561).

'4.  SAME—*Property Acquired by Officer and Director is Not Ordinarily Acquired in Behalf of Corporation.*

Ordinarily property acquired by an officer and director of a corporation will not be taken as an acquisition on behalf of such corporation, unless it already has an existing interest therein, or an expectancy growing out of an existing right, or such acquired property is necessary and proper for the accomplishment of the purpose of the organization of such corporation, and the acquisition thereof by such officer would interfere with the carrying out of such corporate uurpose.  (p. 563).

.5.  DEPOSITIONS—*Depositions in Equity May Be taken by Plaintiff After Cause Has Matured and in Advance of Answer.*

In an equity suit the plaintiff may properly take depositions to support the allegations of his bill, after the same has been filed and the cause matured, in advance of the filing of an answer by the defendant.  (p. 565).

6.  BANKS AND BANKING—*Defendants in Suit by National Bank to Enforce Rights as Equitable Owner of Interest in Corporation Cannot Question Bank's Right to Hold Such Interest.*

The defendants in a suit brought by a national bank to enforce its rights as the equitable owner of an interest in a corporation, because of the improper conversion of the assets of such corporation, will not be permitted to question the right of such bank to hold such stock.  (p. 565).

Appeal from Circuit Court, McDowell County.

Suit by L. E. Tierney against the United Pocahontas Coal Company, the Flat Top National Bank, and others, in which defendant bank joined plaintiff in his contentions. Cause referred to a commissioner, and from a decree of the court for plaintiff and for defendant Flat Top National Bank, the other defendants appealed.

*Modified and Affirmed.*

*Brown, Jackson & Knight,* and *Anderson, Strother, Hughes & Curd,* for appellants.

*A. G. Fox, Russell S. Ritz,* and *Sanders & Crockett,* for appellee Tierney.

*French & Easley,* for appellee Flat Top Nat. Bank.

RITZ, JUDGE:

Plaintiff, a minority stockholder in both the Indian Ridge Coal & Coke Company and Zenith Coal & Coke Company, brought this suit for the purpose of setting aside an alleged sale of the properties of these companies to the defendant United Pocahontas Coal Company, a corporation, upon the ground that said sale was in fraud of his rights, and deprived him of a substantial part of his interest in the two above-named companies. The bill prays that the sales be set aside, and the property of each of said companies restored to them if this could be done; if not, that the plaintiff be decreed to have an interest in the United Pocahontas Coal Company equivalent to the interest held by him in the dissolved corporations; and in the event neither of these remedies could be administered, that a decree be entered against the United Pocahontas Coal Company, the purchaser, and the individual defendants, directors of Zenith Coal & Coke Company and Indian Ridge Coal & Coke Company, for the actual value of his interest in these two companies at the time of the sale. The court below, upon the hearing, found that the sales made of the property and assets of Zenith and Indian Ridge Coal & Coke Companies to the United Pocahontas Coal Company were unfair and in fraud of the rights of the plaintiff, but found that because of the changed conditions in the properties since the sale it was impracticable if not impossible to set the sales aside and restore the properties to the former stockholders; that it is likewise impracticable to ascertain what interest would have to be given to the plaintiff in the United Pocahontas Company in order to represent the interests held by him in the Indian Ridge and Zenith Companies, and decided that the relief to be granted would be a decree against the United Pocahontas Company and the individual defendants, directors of the Zenith and Indian Ridge Companies, for the actual value of the plaintiff's interest in those companies at the time of the

sales of their assets to the United Pocahontas Company, but found that he was not sufficiently advised as to the exact value of plaintiff's stock at the time of the sales to the United Pocahontas Company to enter a decree that would do justice between the parties, and for the purpose of informing himself as to this matter referred the cause to a commissioner to report upon certain specific inquiries. The defendant, Flat Top National Bank was also the owner of stock in the Indian Ridge Coal & Coke Company, and it joined the plaintiff in his contention that the sale of this company's property was not in good faith, and was violative of the rights of the minority stockholders. From the decree holding the sales to be in violation of the rights of the plaintiff and the defendant Flat Top National Bank, this appeal is prosecuted by the defendants United Pocahontas Coal Company and the individuals composing the board of directors of the Indian Ridge Coal & Coke Company and Zenith Coal & Coke Company, who made the sale and transfer of the assets of these companies to the United Pocahontas Company.

In order to an understanding of the controversy involved in this litigation it will be necessary to state briefly the facts antecedent to the transaction under review. The Indian Ridge Coal & Coke Company was organized in the year 1893 for the purpose of mining the coal from a tract of land situate on North Fork in McDowell County. The Company did not own the land, but leased it from the trustees of the Flat Top Coal Land Association, agreeing to pay a royalty of ten cents for each ton of coal mined, with certain provisions as to a minimum royalty and as to the conduct of its mining operation. The moving spirit in the organization of this company was the defendant Worth Kilpatrick, and he has been its guiding influence and mainstay during the entire period of its operation. Fifty thousand dollars of stock was sold at par, and with this money the company's operations were commenced. Subsequently a stock dividend of fifty per cent. was declared, and there was issued to the then stockholders of the company twenty-five thousand dollars of additional stock, making an outstanding capital of seventy-five thousand dollars. This was the condition in the year 1901 when the plaintiff purchased fifteen shares of this stock for the sum of $2250.00. There was some difficulty about hav-

ing the stock transferred to him which is emphasized in the evidence, but which we consider of little if any importance in the determination of the matters involved. One C. Botsford was also a stockholder in this company from the beginning. Ten shares of his stock he had deposited as collateral to secure a debt to the Flat Top National Bank, and upon his failure to pay this debt the stock was sold, and the bank was under the necessity of purchasing the same at the sale, and in this way it became one of the stockholders of the company. All of the stock except this twenty-five shares held by the plaintiff, and the Flat Top National Bank was held by the defendant Worth Kilpatrick and those acting with him at the time of the alleged sale of the company's assets to the defendant United Pocahontas Coal Company.

The defendant Zenith Coal & Coke Company was organized in the year 1903 by one W. H. Coffman. Its operations were conducted on two tracts of land about equal in area and containing in the aggregate about one thousand acres of coal, one leased from Burkes Garden Coal & Coke Company, and the other held under a lease from Pocahontas Coal & Coke Company. The capital stock of this company issued and outstanding was the sum of $456,000.00, divided into 4,560 shares. It does not very satisfactorily appear what amount of actual money was used in the development of this operation. It does appear that of the capital stock four hundred thousand dollars was issued to W. H. Coffman, in consideration of the transfer by him to the company of the two leases above referred to, and presumably the remaining fifty-six thousand dollars of stock was sold for the purpose of realizing funds for the development of the mine. Prior to the time that the Indian Ridge Coal & Coke Company became a stockholder in the Zenith Coal & Coke Company W. H. Coffman was practically the sole owner thereof; in fact, he was the actual owner of all of the stock, four of his associates being qualified to act as stockholders and directors by the issuance to them of one share of his stock for that purpose. During the time that Coffman was producing coal at the Zenith plant he also acted as sales agent for the Indian Ridge Coal & Coke Company, and became largely indebted to that company for coal furnished by it upon his orders for which he

had not paid, as well as for monies advanced ·to him by the Indian Ridge Company. It seems that Coffman also borrowed considerable sums of money from other sources for the development of the Zenith mine, and to secure the payment of this money, as well as the money which he owed to the Indian Ridge Coal & Coke Company, he deposited with a trustee thirty-three hundred shares of the stock of Zenith Coal & Coke Company which had been issued to him. The indebtedness secured by this stock not being paid, the stock was sold by the trustee in satisfaction thereof, and the Indian Ridge Company purchased the same at the sale for about $26.00 a share. There was not realized from this sale a sufficient amount to pay the debt due the Indian Ridge Company by Coffman, and to further secure it he executed a deed of trust upon certain real estate situate in the City of Bluefield. This lien was subsequently foreclosed, and this real estate likewise purchased by the Indian Ridge Company, and the title thereto held by it. After the acquisition by the Indian Ridge Company of this thirty-three hundred shares of stock of Zenith Coal & Coke Company it was re-organized, and the same board of directors and officers elected for it as controlled the Indian Ridge Company, and thereafter, until the sale of the properties of these two companies as hereinafter stated, both of them were managed and controlled by the same board of directors and the same officers. The officers of the Indian Ridge Company procured other stocks of the Zenith Company from time to time until, within a short time after its acquisition of the control of this company, it had procured by purchase sufficient additional stock to make it owner of 4403 shares out of a total of 4560 shares. The remaining 157 shares were held, by the plaintiff L. E. Tierney, 155 shares, and one George E. Stupolsky, two shares, and this was the proportion in which the stock of this company was held at the time of the purported sale of its property and assets to the defendant United Pocahontas Company.

In the year 1914 the defendant Worth Kilpatrick procured a lease for an additional tract of land from the Pocahontas Coal & Coke Company, which lay principally in Wyoming county, and which adjoined the lease operated by the Zenith Coal & Coke Company. This tract of land contained approximately 1200

acres of coal, and at the time he acquired the lease he contemplated operating the same by transporting the coal over the premises of the Zenith Coal & Coke Company, inasmuch as it was impracticable to mine it in any other way. About this same time Kilpatrick also bought all of the stock of the Burkes Garden Coal & Coke Company, the lessor of the Zenith Company as to about one-half of its property, and paid therefor. For the purpose of operating the twelve hundred acres of land leased by him from the Pocahontas Coal & Coke Company he organized the defendant United Pocahontas Coal Company. He was not one of the corporators of this company, but he states that he was the sole owner thereof until the absorption by it of the properties of the Zenith and Indian Ridge Companies, and that at the time of the taking over of these properties by the United Pocahontas Company no other person had any financial interest in it. The lease of the twelve hundred acres was made to the United Pocahontas Company and Kilpatrick, being the sole owner of the Burkes Garden Company, also, for the consideration that he had paid for this property, transferred it to the United Pocahontas Company. So that the status of the affairs of these three companies at the time of the sale to the United Pocahontas Company of the Indian Ridge and Zenith properties was that Kilpatrick was the sole owner of the United Pocahontas Company; that its property consisted of a leasehold on the twelve hundred acres of coal above referred to, and the ownership in fee of about 500 acres operated under a lease by the Zenith Coal & Coke Company. The stock of the Zenith Coal & Coke Company was all owned by the Indian Ridge Coal & Coke Company, with the exception of 155 shares owned by the plaintiff, and two shares owned by another party as aforesaid, thus giving the absolute control of this company to the Indian Ridge Coal & Coke Company. At this time a majority of the stock of the Indian Ridge Company was held by the defendant Worth Kilpatrick; in fact, it was all held by parties acting in accord with Kilpatrick, except 15 shares held by the plaintiff, and ten shares held by the defendant Flat Top National Bank. It will thus be seen that at the time of the sales of which complaint is made in this case Kilpatrick, by virtue of his ownership of a majority of the stock of the Indian Ridge Company,

controlled that company, and also controlled the Zenith Company by virtue of the ownership of practically all of its stock by the Indian Ridge Company, and he was the sole owner of the United Pocahontas Company. It being apparent to Kilpatrick that these three properties could be operated as one more economically and advantageously he conceived the idea of having the United Pocahontas Coal Company purchase the properties of the Indian Ridge and Zenith Companies with a view to combining them all in one operation. To this end, in May, 1915, the United Pocahontas Coal Company made a proposition to each of the other companies to purchase its properties and assets. The proposal made by the United Pocahontas Coal Company to the Indian Ridge Company was to purchase its entire property and assets, save cash on hand, and the stock held by it in the Zenith Coal & Coke Company, for the sum of $18,000.00 in cash, and $200,000,00 par value of the preferred stock of the United Pocahontas Coal Company, making a total of $218,000.00. At this point it may be material to state that the stock of the United Pocahontas Coal Company consisted of 5000 shares of the par value of $100.00 each, divided into $300,000.00 of six per cent. preferred stock, and $200,000.00 of common stock. At the same time the United Pocahontas Coal Company made a proposition to the Zenith Company to purchase the entire property and assets of that company, save cash on hand, for the sum of $5500.00 in cash, and $100,000.00 par value of the preferred stock of the United Pocahontas Coal Company, and the assumption of its indebtedness. These propositions were submitted to the respective stockholders of the Zenith and Indian Ridge Companies, and were by them accepted. The propositions further carried a condition that the sales would be made as of the 31st of March, 1915, that being the end of the fiscal year of each of these corporations, and in case of the acceptance of the propositions the operations would be conducted by the Indian Ridge and Zenith Companies respectively until such time as the transfers could be perfected, it being necessary to secure the assent of the lessors before formal transfers could be made. After the acceptance of these propositions of sale steps were taken to have the properties formally transferred to the United Pocahontas Coal Company. This was not consummated until

about the first of January, 1916, and after this time the Indian Ridge and Zenith Companies were formally dissolved and their charters surrendered. The earnings accruing from the operation of the plants of these companies after the 31st of March, 1915, were turned over to the United Pocahontas Company in accordance with the terms of the sales made to it.

The plaintiff contends that this sale made by the Indian Ridge Coal & Coke Company of its own properties, and of the properties of the Zenith Coal & Coke Company, to the United Pocahontas Company was for a grossly inadequate price, so inadequate as to require that the plaintiff be relieved from its effect. A great amount of evidence has been taken for the purpose of showing the obreptitious conduct of the officers of the Indian Ridge and Zenith Companies toward the plaintiff during the time he was a stockholder in those companies, as well as to show just what assets passed to the United Pocahontas Coal Company by these sales, and the value of such assets. Further, as a part of the arrangement, after the consummation of the sales aforesaid, and the receipt by the Zenith Company of the 1000 shares of preferred stock of United Pocahontas Coal Company, this stock was purchased by the Indian Ridge Company for the sum of $100,000.00, and a dividend was then declared by the Zenith Coal & Coke Company out of the cash it had on hand, received from the sale of the preferred stock aforesaid, as well as its other monies, to its stockholders, amounting to about $29.00 a share, and a dividend also declared by the Indian Ridge Company of $300.00 of preferred stock in the United Pocahontas Company to the holder of each share of stock in the Indian Ridge Company, as well as a dividend in cash covering the remaining assets. The contention of the United Pocahontas Company and the individual defendants is that the price paid for the property and assets of the Indian Ridge and Zenith Companies was an adequate, full, fair and complete price, and that the transaction is absolutely free from any fraud or unfair conduct upon the part of any party connected therewith, while the contention is, on the part of the plaintiff and the Flat Top National Bank, that this sale was made for a grossly inadequate price, and that the price paid was only a very small percentage of the actual value of the assets of this company, and that it

amounted simply to a scheme or device upon the part of the defendant Worth Kilpatrick and his associates to convert the assets of these companies into another corporation in which the plaintiff was not a stockholder, and to compel him to take for his stock in the Indian Ridge and Zenith Companies much less than its real value.

It is shown that during the time the Indian Ridge Company was operated, to-wit, from the year 1893 to the year 1915, a period of 22 years, it paid an average dividend of ten per cent. per annum upon its capital of $75,000.00, which would be equivalent to 15 per cent. upon the $50,000.00 actually invested, and it is argued from this that $218,000.00 for the property was not only a fair price, but was more than the same was reasonably worth; that a coal property which did not earn more than this rate upon its capital could not be considered a very attractive investment. This argument might be sound if it were not for the fact that it has no basis in the evidence. Instead of the earnings of the Indian Ridge Company being limited to the dividends paid to its stockholders, it appears that only a comparatively small part of these earnings were paid out in dividends. At the time the assets were transferred to the United Pocahontas Company the Indian Ridge Company had on hand, in addition to its equipment, bills receivable amounting to $149,691.07; amounts due it for coal sold amounting to $10,164.67; its Bluefield real-estate amounting to $26,405.31; cash on hand amounting to $49,290.94; stock in the Zenith Coal & Coke Company amounting to $132,090.00; besides its merchandise inventory amounting to $6,000.00; or a total of assets on hand which represented earnings of the company amounting to $373,641.99, so that it is apparent that the Indian Ridge Company, at the time of making this sale, could have declared a dividend of over 500 per cent. out of its actual earnings to its stockholders, and spreading this over the period of 22 years would be equivalent to a dividend of something like 22½ per cent. a year in addition to that already declared and paid out; or, if we estimate this dividend upon the actual amount of money paid in, to-wit, $50,000.00, then it could have declared a dividend of over 700 per cent. on that capital, which would make an average dividend of more than 30 per cent. a year which, added to the dividend

already declared and paid out, would show earnings of more than 45 per cent. a year during all of the time that this company was in business. It would seem that this would be a reasonably attractive investment to a purchaser, even at the price of $218,-000.00. But it is asserted that, while the proposition shows $218,000.00 paid for the assets of the Indian Ridge Coal & Coke Company, this included very much more than its mining operation, and it appears from the record that this is true. In addition to getting the mining plant and the leasehold, the purchaser acquired the bills receivable, amounting to $149,691.07; amounts due for coal sold amounting to $10,164.67; the Bluefield real estate amounting to $26,405.31; and the merchandise inventory amounting to $6,000.00, or a total of $192,261.05; from which was deducted the debts of the Indian Ridge Company, leaving a balance of about $177,000.00 of assets turned over to the United Pocahontas Company which were not part of the mining plant of the Indian Ridge Company; and taking this from the purchase price of $218,000.00 would leave $41,000.00, the actual consideration for the mining plant. It appears that the items of bills receivable above referred to were amounts due the Indian Ridge Coal Company by the Zenith Company, and by the defendants Kilpatrick and Armstrong, which were perfectly solvent, and which were subsequently realized upon. The same is true of the item due for coal sold, and the merchandise inventory was represented by goods actually on hand. The value of the item, Bluefield real estate, is not so certainly established, but it was carried upon the books of the company at the value above indicated, and it may be said that it was reasonably worth this amount, as it does not seem to have been the habit of this company to carry anything upon its books at an excessive valuation. So that the question, so far as the Indian Ridge property is concerned, is whether or not $41,000.00 can be said to be a reasonable price for the plant and leasehold of this company. It appears that the company's lease consisted of about 900 acres of coal, of which one-third had been mined out, leaving two-thirds thereof. It is true at that time 22 years of the life of the lease had run, leaving only 8 years more for operation under its terms, but there is a clause providing for renewal of the lease for another 30 years upon the same terms, which it is

argued the Indian Ridge Company is not in position to take advantage of because of breaches by that company of some of the terms of the lease. We do not think there is very much in this argument, inasmuch as the defaults that are pointed out happened long years ago, and it is not to be assumed that they could be taken advantage of by the lessor after having acquiesced in the conduct and management which might be construed to be breaches of the lease for all these years. It is argued by the defendants that the leashold is of no value; that the only thing to be considered is the physical properties put upon the lease by the Indian Ridge Company, and it contends that $41,000.00 is a reasonable price for these properties, and that they were not worth any more than that sum at the time of the sale. We cannot agree with the conclusion that this leasehold is of no value, and should not have been given some value in this transaction. It appears that the defendant Kilpatrick took a lease adjoining these properties at a royalty of 15 cents a ton, while this lease carried a royalty of only ten cents a ton, and certainly if an adjoining lease with apparently no better conditions than existed at the Indian Ridge mine could be handled under a royalty of 15 cents a ton, the leasehold of the Indian Ridge property at only ten cents a ton must be of considerable value to the owner. Further than this, it appears that this lease was assessed upon the land books of McDowell County for the year 1915 at a valuation of $10,000.00, and it is not to be assumed that it did not have at least this value at that time.

Considerable criticism is also made of the method resorted to by the directors of the Indian Ridge Company in fixing the value of its equipment at $41,000.00. It appears that there had been spent on this plant more than $200,000.00, and that on the very day of the sale it was depreciated more than $100,000.00, and something like $100,000.00 within a few years prior to that time, leaving only $41,000.00 the value as shown by the books of the company at the time of the sale. These items of depreciation are justified by the officers of the company upon the ground that for many years no depreciation was charged off on the books, and it had been determined that the true value should be shown by the books sometime before this sale was made, but this purpose had not been entirely accomplished.

While it is admitted that a plant like this suffers substantial depreciation each year, it is contended by the plaintiff that the depreciation charged in many instances is excessive and entirely unjustified.    It appears from the books that in the case of some of the items of equipment the entire amount expended thereon was charged off, and that in others practically the whole thereof was charged off as depreciation.    The item of money expended for railroad sidings is charged off entirely upon the theory that after the siding was constructed it belonged to the railroad company, and was of no value to the Indian Ridge plant.    This could hardly be justified, for it must be true that this money was expended for the purpose of furnishing means with which to market the coal mined, and the company will have the use of the siding during the entire life of the mine.    While it has no property in it, it is a facility which the company had to spend money to obtain, and it is entirely unjustified to charge off the entire cost at any particular period.    The proper way would be rather to divide the entire cost of this siding over the probable life of the mine, and charge off the proper aliquot part each year of the operation.    It is not necessary for us to go into the various items of depreciation for the purpose of determining whether or not they were entirely justified.    We think the evidence justified the court's finding that the sale of this property of the Indian Ridge Company at the price at which it was made to the defendant United Pocahontas Coal Company was so unfair to the plaintiff and the Flat Top National Bank as to justify the decree that the plaintiff and the defendant bank were entitled to treat the same as not binding upon them, and to have a recovery for the actual value of their interests in the plant at the time of the sale.

The proposition for the purchase of the Zenith Coal & Coke Company's plant was to give $105,500.00 therefor, $5,500.00 in cash, and $100,000.00 in preferred stock of the defendant United Pocahontas Coal Company, and to assume the current and fixed indebtedness of the Zenith Company, amounting to the sum of $113,992.33, which would make a consideration of $219,492.33 paid for the entire assets of the company, except the cash on hand. Included in these assets were certain items such as bills receivable, stock of merchandise, and accounts due the company, amounting

to the sum of $36,121.86, which would leave approximately $185,000.00 paid for the mining plant and leasehold. This valuation is arrived at from the books of the company, and is the exact amount which the books showed the physical properties, such as tipples, houses and equipment, were worth at the time of the sale. Considerable deductions were made from the actual cost of these several items for depreciation, and in some cases the entire value of an item is charged off as depreciation. This is notably true in the case of the amount expended for building railroad tracks to the mines, amounting to about $25,000.00. The defendants contend that this was all properly charged off the books for the reason that after the tracks were built they belonged to the railroad company, but the observation we made in regard to the tracks built by the Indian Ridge Company is applicable here. The tracks are there and can be used, or may be used, by the company during all the life of the plant for the purpose of shipping this coal to market, and there is no reason why the entire cost of them should be charged off at one time. It likewise appears that the leasehold of this company was carried on the books for many years at the sum of $400,000.00, but before the sale this item was charged off and the leasehold treated as of no value whatever. We have not undertaken in this review to cover in detail all of the evidence bearing upon these questions, but simply to refer to it sufficiently to indicate the propriety of the finding of the lower court upon the fairness of these sales. If a decree had been entered below for a certain amount to be recovered by the plaintiff it would then be necessary for us to review in more detail the facts to determine whether or not the amount decreed was justified, but as before stated the decree below only finds that the plaintiff and the Flat Top National Bank are not bound by these sales, and are entitled to have decree for the actual value of their stock at the time of the purported sales, and referred the cause to a commissioner to ascertain this amount, the evidence not being sufficiently definite in that regard to advise the court as to the proper amount to be decreed.

In a case like this where the purchaser of the property is also in effect the seller, the utmost good faith is required. The defendant, United Pocahontas Coal Company, the purchaser of

this property, was entirely owned by the defendant Kilpatrick, and for the purpose of this litigation he is the purchaser. He was likewise in effect the seller, for he owned a majority of the stock in the Indian Ridge Coal & Coke Company; and the Indian Ridge Company, in which he owned such majority of the stock, owned practically all of the stock of the Zenith Company. It will not do to say that Kilpatrick believed he was acting for the benefit of all of the stockholders of the Zenith and Indian Ridge Companies. There is a higher criterion fixed which must be satisfied before the transactions can meet with the approval of a court of equity. His interest as purchaser was in direct conflict with his interest as the seller of the properties. On the one hand he was interested in getting as large a price as possible, while as the purchaser of the property he was interested in procuring it at the least possible price. Which one of these interests was the dominating one at the time he made the trade? It appears that he was the sole owner of the purchasing corporation, while his interest in the selling companies was not so large. It might, therefore, be supposed that he would be influenced to favor the purchasing company because his interest was that way, and this influence upon the actions and conduct of men, because of their interest, is so subtle and insidious that it at times affects the judgment and conduct of those who could not be charged with any deliberate purpose to wrong and defraud. The courts recognize that this is true and do not allow such transactions to stand until they have been subjected to the closest scrutiny and found to be fair to all of the interests affected by them. 3 Cook on Corporations, § 662; *Hope* v. *Salt Co.,* 25 W. Va. 789; 7 R. C. L., Title "Corporations," § 287, etc.; 4 Fletcher Cyclopedia Corporations, § 2360. Indeed, it has been held by some courts that such transactions are absolutely void, and that an officer of a corporation purchasing its assets can take no advantge from such a sale. We do not think this is the correct doctrine. If such a transaction is entirely fair and prejudices the rights of no interested party, there is no reason why it should not be upheld, as well as such a sale to an entirely disinterested party, and it may be said in passing that a reasonable test to be made of the fairness of such a sale is, would the proposition from one discon-

nected with the whole affair have been accepted by those acting for the selling company? Having come to the conclusion that the finding of the lower court to the effect that the purchase price was substantially less than the actual value of this property, under the doctrine above laid down, the plaintiff is not bound thereby.

The defendants contend that the bill in this case is multifarious because it joins in one suit the plaintiff's demand for his interest in the Zenith Company, as well as the demand for his right in the Indian Ridge Company. The relation of these companies to each other is sufficiently clear from what we have already said. Practically all of the stock of the Zenith Coal & Coke Company belongs to the Indian Ridge Company, and for the purpose of the transaction involved here the stockholders of the Indian Ridge Company were the real actors. They acted for themselves in disposing of the Indian Ridge Company's assets, and then they acted for the Zenith Company in disposing of its assets because of their control of the Indian Ridge Company, so that it may be said that the wrongful act of which complaint is made was the act of the Indian Ridge Coal & Coke Company and its stockholders. Then, too, the transaction involved the purchase by the Indian Ridge Company of the preferred stock turned over to the Zenith Company by the United Pocahontas Company. The directors and officers of the Zenith Company were practically the same as the directors and officers of the Indian Ridge Company, and they were directors and officers of the Zenith Company, not because they were stockholders of that company, but because of their interest in the Indian Ridge Company. It will thus be seen that while it involved the delivery to the defendant United Pocahontas Coal Company of the assets of the two companies, it really was accomplished by one act, and that the act of the stockholders of the Indian Ridge Company. Even were this not the case it appears from the record that all of the claims of the plaintiff have been conveniently litigated in this one suit, and that to have brought two suits for the accomplishment of the purpose would, instead of saving expense, involve the duplication of much of the work necessary to be done. There is no certain rule for determining when a bill is multifarious. If justice can

be conveniently administered by the method adopted, the objection of multifariousness will not lie, unless it is so injurious to the complaining party as to render it inequitable and unjust to so proceed. *Johnson* v. *Sanger,* 49 W. Va. 405; *Jordan* v. *Liggan,* 95 Va. 616. In this case it not only appears that the controversies can be conveniently disposed of in one suit, but it sufficiently appears that resort to one suit offers a much more convenient and less expensive method of disposing of them than if resort had been had to separate suits.

The defendants further contend that plaintiff is barred in this case because of laches. They say that his delay in instituting this suit for more than two years after the alleged sales deprives him of any right to question the validity of those transactions. If the plaintiff had knowledge of these sales at the time they were made, and showed no excuse for the delay in bringing this suit, there might be some basis for this contention, but laches is a defense in a case like this only when the stockholder with full knowledge of the facts has without excuse delayed an unreasonable length of time in bringing his action. These two elements, knowledge and delay, are the essential elements of such a defense. Until the stockholder has full and complete knowledge of all the essential facts which would be likely to induce him to institute the action, the time has not arrived from which it may be said laches will begin to run. 3 Cook on Corporations, § 731. It appears in this case that the plaintiff did not attend the meetings of the stockholders of either Zenith or Indian Ridge Companies at which these sales were made, and he says that he did not know of such meetings. It appears, however, that these sales were made at the regular annual meetings of those corporations, and that due notice was given thereof by publication in a newspaper, as required by the by-laws, and the defendants say that the plaintiff will be charged with knowledge of everything that happened at those meetings. It may be said that the plaintiff must take notice of the provisions of the by-laws in regard to meetings, and that he will be bound by any action of the stockholders had at a meeting of which notice has been given in accordance with the terms of the by-laws, so long as such action is otherwise proper. But can a minority stockholder be charged

with knowledge of a transaction by which all of the assets of the corporation are disposed of at an inadequate price? A minority stockholder may be entirely satisfied with the management and control of the corporate business, and not care to participate in its annual meetings, when he would have very serious objection, however, to the company disposing of all of its property to one of the large stockholders and an officer and director at a price very much less than its actual value. It would seem that where the action of the stockholders which was brought in question involves their good faith laches will not begin to run against one affected by it until he has actual knowledge of the tranc-action. In this case he did not have such actual knowledge until November, 1915. During the intervening time the business of these two companies was conducted just as it had been there-tofore, and it was not until then that the secretary and treasurer of the companies sent notice to the stockholders informing them that the sales had been consummated, and advising them the amount to which each stockholder in the respective companies was entitled. As soon as Tierney received this notice he questioned the right of the stockholders to make these sales, and called upon the president and the secretary and treasurer of the Zenith and Indian Ridge Companies to allow him to audit the books of these companies with a view of determining whether or not he would accept the provision made for him. He was advised that this privilege would be accorded, and he at once, or at least within a very short time, employed an auditor for the purpose. This auditor communicated the fact of his employment to the secretary of the two companies, and asked that the books be turned over to him for the purpose of making the audit. An appointment was made by the secretary for this purpose, and subsequently and before the day appointed had arrived, the secretary postponed this examination to a later date, and when this day arrived the auditor was then informed by the president of the companies that they had been dissolved in accordance with the law, and that he could not permit any examination of their books by an outside party. Upon this refusal of the officers of the Indian Ridge and Zenith Companies to permit an examination of the books and records of the companies by Tierney, so that he might determine what action he would take, he insti-

tuted a suit for the purpose of compelling them to allow him to make such examination. It does not appear that there was any delay in the prosecution of this suit. A final judgment was rendered therein in the nisi prius court compelling the officers of the two companies to permit Tierney to make the examination. The president and secretary of the company then carried the case on appeal to the Supreme Court of Pennsyvnia, which resulted in a judgment of affirmance. Shortly thereafter, and in the summer of 1917, the books were turned over to the auditor for examination. This examination was completed about the first of September of that year, and as soon as completed was submitted to the plaintiff. Upon going over the same with his attorneys he concluded that the sales were for a grossly inadequate price, and were greatly to his disadvantage, and immediately communicated this conclusion to the defendant Kilpatrick, and brought this suit for the purpose of obtaining relief. The defendant, Flat Top National Bank, during all of this time did nothing to prosecute its claim, but it was understood between it and the defendant Kilpatrick that it could delay the determination of what it intended to do until Tierney completed his examination, and that its conclusions would be based upon the result of that examination, and it appears that as soon as this information was furnished its directors, of which the plaintiff Tierney was one, as well as its President, the bank repudiated the sales, and demanded what it considered full compensation for its interest in the Indian Ridge Company. It will be seen that Tierney had no knowledge at all of these sales until the fall of 1915, and that he did not then have such full information as to the financial condition of the two companies-as justified him in coming to a conclusion as to whether the sales were fair or not, and that he had to resort to litigation in order to procure this information, and that as soon as it was procured this suit was instituted. Under these circumstances, neither the plaintiff nor the bank, which was acting in concert with him in this matter, can be charged with any laches. They both acted just as soon as they were able to get the information necessary for intelligent action.

It is urged by the plaintiff in this suit that the action of the defendant Kilpatrick in acquiring the Wyoming lease, which was

subsequently executed to the defendant United Pocahontas Coal Company, must be held to be for the benefit of the Zenith & Indian Ridge Companies, and this contention is also made with regard to the acquisition of the stock of the Burkes Garden Coal & Coke Company. The relation of these companies to the Zenith and Indian Ridge Companies has been before stated. The Burkes Garden Company was the lessor of the Zenith Company as to about one-half of the property it was operating, and the Wyoming county lease lies adjacent to the Indian Ridge and Zenith leases, and the coal therefrom can be mined most conveniently over the property of the Zenith Company. Do these facts of themselves justify the conclusion that the acquisition of this property by Kilpatrick was for the benefit of the Indian Ridge and Zenith Companies? It must be borne in mind that because one is a stockholder and officer of a corporation he is not thereby bound to act only on behalf of that corporation. It is true that if he acquires an interest in an estate in which the corporation already has an existing interest, or where he acquires an interest outside, which the corporation had contemplated and desired acquiring, by overreaching the corporation, or taking advantage of knowledge which he has as an officer of it, such acquisition will be taken to be for the benefit of the corporation, but there is a wide field left for individual activity, and it may be generally said that the legal restrictions which rest upon corporate officers in their acquisitions of property are limited to the property wherein the corporation already has an existing interest, or in which it has an expectancy growing out of such existing right, or to cases where the officers' interference by acquiring the property will in some degree prevent or hinder the corporation in effecting the purpose of its creation. 4 Fletcher Cyclopedia Corporations, § 2281. It appears here that neither the Indian Ridge Company nor the Zenith Company had any interest in the lease acquired by Kilpatrick, nor does it appear that the acquisition of it by Kilpatrick in any way interfered with either of these corporations, nor does it appear that either of them had in contemplation the acquisition of this property, and that Kilpatrick by acquiring it prevented them from carrying out such a purpose. While the court below did not specifically hold that these acquisitions

were for the benefit of the Indian Ridge and Zenith Companies, he did in effect so hold, for he required the commissioner in ascertaining the value of the properties, to include the value of these properties, and to examine the books of the United Pocahontas Company for the purpose of ascertaining such values, and, of course, this inquiry could only be directed upon the basis that these properties really belonged to the Zenith and Indian Ridge Companies, or one of them. In this the circuit court was in error.

It is argued that the Indian Ridge and Zenith Companies could not properly be made parties to this suit for the reason that they had been legally dissolved prior to the institution thereof. In view of the action of the court below in granting to the plaintiff only a decree for the value of his equitable interest in the corporations this objection becomes immaterial. There is no relief given against either of these companies, nor is their presence necessary to the granting of the relief which the court did give. It is therefore immaterial whether or not they are properly or improperly before the court.

An exception was taken to the reading of certain depositions taken on behalf of the plaintiff before the filing of the answers, the ground of such exception being that the depositions were prematurely taken. There is no merit in this objection. The plaintiff had a right to file his bill and support the same by proof if he desired to do so, to the end that he might be entitled to a decree at the first term of the court should the defendant come in at that time with an answer denying the allegations of the bill. If this were not the case the defendant could always reserve his answer until the first term of court and then by filing the same compel a continuance of the case. Of course, it would be improper to take proof until there is a pleading filed by the party taking it which it is intended to support, but we perceive no reason why a plaintiff should be compelled to await the convenience of a defendant as to the taking of his proof. Rather should his vigilance in having his case ready for a hearing at the earliest day possible be commended. *James* v. *Piggott,* 70 W. Va. 435.

A suggestion is made that the Flat Top National Bank is acting in excess of its powers in holding this stock of Indian Ridge

Company; that it was its duty to dispose of the same within a reasonable time after it acquired it. Whether this is true or not is not material here. The question of the authority of the bank to enforce its rights as the equitable owner of an interest in the Indian Ridge Coal & Coke Company cannot be brought in question by these defendants. If in holding this stock it is acting in excess of its powers, only the United States Government or, perhaps, some of its own stockholders, can raise that question. *Bank* v. *Whitney,* 103 U. S. 99.

It is suggested that inasmuch as this suit under the holdings of the lower court will simply result in a money decree for the value of the interest of the plaintiff and the Flat Top National Bank in the Indian Ridge and Zenith corporations, an action at law would be entirely adequate, and that equity cannot for that reason take jurisdiction. The interest of a stockholder in a corporation is an equitable one. He cannot ordinarily maintain an action at law against the corporation to recover that interest. Courts of equity have jurisdiction to enforce his rights, whether it be to recover the value of such equitable interest from one who has secured the same in an improper manner, or to set aside an unauthorized and improper transfer and restore the corporate assets. The nature of his interest in the subject matter being purely equitable, equity has jurisdiction, even though his only purpose is to collect the value of that equitable interest. In the decree in this case the commissioner is authorized and directed to employ mining engineers and such other assistants as may be required and necessary to make explorations and thoroughly prospect the property owned by the Indian Ridge and Zenith Companies, and to tax the costs and expenses of such explorations in his report. There is nothing in this case which indicates the necessity for any such investigations or explorations in order to determine the value of these properties. In the case of Indian Ridge Coal & Coke Company, the property has been worked for more than twenty years, and in the case of the Zenith Company the property has been operated for more than fifteen years, and it would seem that where these active operations have been carried on under leases during all these years sufficient information would be available to ascertain their true value without going to the expense of further pros-

pecting and exploration. We are of opinion that there is nothing in the record justifying that part of the decree.

The court also directs the commissioner to ascertain all of the property of every kind and character of the defendant United Pocahontas Coal Company; to ascertain the number of shares of common and preferred stock of said company which have been issued, and by whom the same are held; the amount of money paid for said stock, and by whom paid; the names of the persons acting as directors of the said company; the value of the leasehold held by said company known as the Wyoming Leasehold; and the value of the Burkes Garden Coal & Coke Company property above referred to. In view of our finding that these acquisitions by the United Pocahontas Company were not for the benefit of either the Indian Ridge or Zenith Companies, these inquiries would be entirely useless, and would simply be imposing unnecessary expense and burden upon the parties to this suit. The decree will be corrected so as to eliminate therefrom these requirements.

The defendants are also required to produce the books and records of the United Pocahontas Company for the examination of the commissioner, and for his assistance in determining the value of the properties of that company. Inasmuch as we have indicated above that this is not a proper inquiry to be made in this case, this request for the production of books and records is likewise an improper one, and that requirement will be eliminated from the decree.

Our conclusion is to affirm the decree after modifying it in the manner above indicated, with costs to the appellants.

*Modified and Affirmed.*